## Clark's Appeal.

1. M. and C. entered into partnership, M. contributing real estate at an estimated value, which was carried into the firm's stock account to M.'s credit. This was in equity partnership property, the legal title remaining in M.

2. M. reserved the right on dissolution not to be bound by the estimated value, and to withdraw the property. This was a provision to correct the valuation.

3. During the partnership the buildings were burned and rebuilt by firm funds. M. withdrawing the real estate on dissolution would take it at its then value.

4. The property having been carried into the stock account to M.'s credit, belonged with its accretions to the firm, to be accounted for as firm assets.

October 14th 1872. Before THOMPSON, C. J., READ, AGNEW, SHARSWOOD and WILLIAMS, JJ.

Appeal from the District Court of *Allegheny county:* In Equity: No. 138, to October and November Term 1871.

The bill in this case was filed June 6th 1867. The complainant was Robert D. Clarke, and the defendant James Marshall. During the pendency of the proceedings, the defendant died, and Thomas M. Marshall and others, his executors, were substituted.

The parties had been partners under the firm of James Marshall & Co. The bill was for a decree for an account, payment of the balance which might be found due, and that certain real estate was the property of the firm.

The partnership agreement was the following:—

"Agreement, made between James Marshall and Robert D. Clark, this 2d day of January, A. D. 1860, witnesseth that said parties have formed a copartnership under the name and style of James Marshall & Co., for the purpose of carrying on a general foundry business in the city of Pittsburg. The said James Marshall has contributed capital stock, including the warehouse on Liberty and Wood streets, the foundry property on Locust and Pine streets, and a lot called the Stable Lot on Pine street, and two vacant lots on Locust street, Pittsburg, and four sand-lots in Lawrenceville, estimated at $37,501.35, as per inventory in the stock book of the concern. And in consideration of said Robert D. Clark contributing his personal labor and attention to the business, it is agreed that said Clark shall be entitled to one-fourth part of the net profits of the partnership, after allowing said Marshall six per cent. on the said capital contributed by him as aforesaid, that is to say, after deducting all expenses, and after allowing said James Marshall six per cent. interest on his said capital stock, then the net profits of the business to be divided in the manner aforesaid, to wit, James Marshall three-fourths and Robert D. Clark one-fourth thereof. It is further understood

that in case of a dissolution of the partnership the aforesaid valuation (as per said inventory) of the real estate shall not be binding or conclusive as against said James Marshall, and he, Marshall, shall have the right then or at any other time to withdraw said real estate from the firm *for the purpose of sale or disposal* if he shall desire to do so."

The partnership was dissolved by mutual consent, February 24th 1866, Marshall having bought Clark's interest, and being made the liquidating partner.

The valuation of the real estate in the inventory, which was referred to in the agreement, was as follows:—

| | |
|---|---:|
| Warehouse . . . . . . . . . . . . . . . | $ 8,000 |
| Foundry property running from Pine to Locust street, stable lot, sand lots . . . . . . . . . . | 14,000 |
| Lawrenceville lots, . . . . . . . . . . . | 800 |

This real estate, together with other property, amounting at its valuation in the inventory to $37,501.35, as stated in the agreement, was credited to Marshall in the stock book of the firm.

About the 8th of June 1863, the foundry property, " on Locust and Pine streets, was burned."

Besides the foregoing facts, the bill set out that the partners rebuilt the foundry property with partnership funds, at a cost of about $35,000; that the partners had had no settlement, and the value of the plaintiff's interest had not been ascertained; that on the dissolution the defendant took possession of all the assets of the firm, including the real estate, and still retained them; that at the dissolution, the real estate was much more valuable than the estimates in the inventory, resulting both from the improvements and the general advance in the value of real estate; and that upon a settlement there would appear to be a large sum of money due to plaintiff from defendant.   By his answer the defendant averred, amongst other things, that the " real estate was never intended to be vested in the plaintiff, further than in its use for the purposes of the firm in the prosecution of their business, and was to revert to defendant at his option."   He denied " that the plaintiff has any right to the advance in the price of the 'real estate,' the real estate having been contributed to the use of the firm at a nominal value, far below its real value, at the date of the article of agreement, with the express and notorious understanding that respondent could withdraw said real estate from the firm at his pleasure at the nominal value at which it was contributed, and defendant did withdraw said real estate from the firm, and it was understood and agreed by the plaintiff at the time of the dissolution."

A general replication was filed, and Thomas Ewing, Esq., was appointed master to state an account, and report the facts.

The master, amongst other things, reported: " * * * "After January 1st 1863, no *complete* inventory of the firm assets was

[Clark's Appeal.]

ever taken, nor was there any balance sheet made out, nor was there any division of the profit and loss of the business.

"On the 6th day of June 1863, the foundry buildings, with all their fixtures, machinery and contents, were destroyed by fire. Immediately thereafter the firm proceeded to rebuild the destroyed buildings on the old foundations, and to replace the machinery, tools, patterns and materials lost by the fire. * * *

"The entire cost of the new buildings, machinery and fixtures, as appears from the books of the firm, was $35,448.80. The insurance received by the firm on the old buildings and their contents, destroyed by fire, was $10,000, of which $7000 was on the buildings and fixtures, and about $3000 was on tools, patterns, &c. * * *

"The parties dispute in regard to a large portion of the items going to make up the account. 1st, As to the value of the personal property of the firm, and 2d, As to the value of the real estate, and the rights of the respective parties thereto.

"It is claimed by the defendant, that James Marshall was entitled to have back all the property he put into the firm, or its equivalent in amount and condition, regardless of the destruction by the fire. I can see no ground for this claim in regard to the personal property. * * *

"The rights of the respective partners in the real estate under the agreement, is the most serious question in this case.

"Plaintiff and his counsel claim that, under the agreement, James Marshall had not, at any time, a right to withdraw the real estate (put into the firm), except to sell and dispose of it for the benefit of the firm, and account for the proceeds thereof, regardless of the valuation at which it was put in.

"On the other hand, defendant and his counsel claim that under the agreement, James Marshall merely loaned the use of the real estate to the firm at a nominal valuation, on which he was to receive interest as a rent, that the firm was bound to keep up the buildings and fixtures, in as good condition as they were in at January 1st 1860; that the loss by fire was the loss of the firm; that the new foundry buildings and fixtures are inferior to those in existence before the fire, and that James Marshall was entitled to take out, at the dissolution, all the real estate which he put in at the formation of the partnership, at the same nominal valuation as was put upon it at the first. * * *

"The master cannot interpret the agreement in accordance with the views of either party to the controversy.

"To interpret it as claimed for plaintiff, the agreement must be read without the last clause, in reference to the real estate; but that clause was intended to have, and it has a meaning. If Mr. Marshall had no power over the real estate other than that of an ordinary partner, why declare that 'he may withdraw it,' &c.?

If he, after withdrawing it, was to account for the proceeds, why insert the condition that this valuation shall not be binding or conclusive as against said James Marshall?

" To interpret it as claimed for the defendant, the agreement must be read to ignore the statement that ' James Marshall has contributed capital stock, including,' &c., as per inventory in the stock book of the concern. * * *

" Reading the whole agreement, the only reasonable interpretation that I can find, to give effect to all portions of it, is: That James Marshall had the *option*, at or before the dissolution of the partnership, to reclaim the real estate in question, at the valuation put upon it in 1860; and he had, at any time up to the time of the fire in June 1863, a right to withdraw this property from the firm, at the inventoried value, for sale or *disposal* (which term, ' disposal,' I take to mean any disposition he might see fit to make of it, either to use it himself, sell it, or give it away), and that he had that right at the time of the dissolution of the partnership unless he had by some act or omission estopped himself from claiming his option. But if he claimed to exercise that option, he must take it with equitable burdens. The loss by fire will be his loss. The firm was not bound to rebuild a foundry equal or superior to the one destroyed, and then restore it to him in the improved condition, without repayment of the cost of the improvements made with his consent and co-operation. And even if James Marshall is not estopped from claiming the foundry property at the old valuation, he should be required to pay the cost of the new buildings and fixtures, less the insurance realized on the old ones.

" In addition to the facts already stated in regard to the real estate and buildings, it appears that the firm paid all the taxes and insurance on the property, from the formation of the partnership to its dissolution. At the commencement, the policies of insurance on the buildings were in the name of James Marshall, and when these policies then in existence expired they were renewed in the name of James Marshall & Co. They were so at the time of the fire, and afterward up to the time of the dissolution of the partnership.

" In November 1863, the firm bought a lot adjoining the foundry, for $650, and in June 1864, a similar adjoining lot for $600; and these lots were afterward enclosed as a part of the foundry yard. Mr. Clark attended to the purchase of the lots, and took the title thereto in the name of James Marshall, but paid for them with the funds of the firm.

" In 1865, a similar purchase was made of six lots in Lawrenceville, wanted by the firm for sand purposes. The cost of these lots was $937.39. Mr. Clark attended to this business, paid for the lots with the funds of the firm, and took the title in the

22 P. F. SMITH—10

name of James Marshall. * * * Without discussing the testimony at length, it appears to the master that these lots so purchased with the funds of the firm, were the absolute property of the firm at the time of its dissolution, and that James Marshall must account for them, not at cost, but at their actual value. * * * As to the original valuation, I find as a fact, that the real estate put in by James Marshall, was at a price below its actual marketable value at the time; the warehouse on Wood street being about fifty per cent. below its actual value. The foundry property, put in at $14,000, was much ˙nearer its value, but was worth probably about $18,000 in 1860.

"In regard to the relative value of the old and new buildings and machinery, I find that the new erections were considerably more valuable than the old ones, the difference being perhaps about $10,000 to $15,000. * * *

"But is not James Marshall estopped by his acts from claiming his option to withdraw the foundry property from the firm assets at the appraisement of 1860? He stood by and actively aided in the expenditure, by the firm, of an amount three times as great as the then value of the naked lots; and from that time money was expended as though this was the absolute property of the firm. If Mr. Marshall intended to claim his option as to that property, he should have made his claim before the new foundry was built. His action was equivalent to saying: 'I will not attempt to reclaim this property;' and in equity he is estopped from now claiming it at the old valuation. And, as in the original inventory, the lots on which the foundry buildings stand, the stable lot and the old sand lot at Lawrenceville, are all included with the foundry at the valuation of $14,000, they must go now together. The two vacant lots across Locust street from the foundry buildings have never been improved, and have merely been used for storing material, but they have from the first been used as a part of the foundry property, and should be treated as a part of it.

"In regard to the Wood street warehouse property, the equities are all in favor of Mr. Marshall retaining it at the old valuation. The original appraisement was but nominal.

"The firm had it during the continuance of the partnership at a very low rent—they never spent any money on it except for ordinary repairs. And the increased value arises wholly from the natural and extraordinary appreciation of real estate in its neighborhood. It is not connected in any way with the foundry, being at least half a mile distant, and it would be inequitable to hold Mr. Marshall estopped from reclaiming it at the old valuation.

"The master has thought proper to annex different statements of the account of the partners, in accordance with the different views the court may take in regard to the real estate; all, however,

based on his findings of fact in regard to the personalty, and the value of the real estate.

"1. In accordance with the views of the master as heretofore set forth, giving the firm the full value of the foundry property, and the lots purchased during the continuance of the partnership, and giving James Marshall the remaining real estate at the valuation of 1860; and of course giving credit to James Marshall for the balance of his stock account, less the property thus withdrawn.

"2. To be adopted in case the court should be of the opinion, that Mr. Marshall should be permitted to withdraw the entire real estate put in by him in 1860, chargeable with the cost of construction, less insurance received.

"3. In accordance with the views of plaintiff's counsel, viz.: That James Marshall, under the agreement, could not withdraw any part of the real estate at the valuation of 1860.

"4. In accordance with the views of defendant's counsel, viz.: That James Marshall is entitled to withdraw the entire real estate put in by him, at the valuation of 1860, without paying anything for the new buildings and machinery erected to replace those destroyed by fire." * * *

According to these schedules respectively the amounts due would be as follows:

1. Due by defendant to plaintiff . . . . . . . $ 7,405.59
2.    "   "        "     "     "      . . . - . .   2,913.94
3.    "   "        "     "     "      . . . . . . .  11,405.49
4.    "   "  plaintiff to defendant  . . . . .       6,473.25

After exceptions by both parties to the master's report, the court decreed that the report of the master be confirmed in accordance with schedule number two, as attached to his report, and that the defendants pay to the plaintiff the sum of $2,913.94, with interest from January 1st 1866, amounting to the sum of $3,544.65, &c.

The plaintiff appealed to the Supreme Court, and assigned the decree of the District Court for error.

*M. W. Acheson*, for appellant.—By the express terms of the copartnership agreement, the real estate was put into the firm as capital stock, and thereby became part of the firm's assets and stock—as much so as the personal property embraced in the inventory, with which the real estate was blended in the valuation of $37,501.35.

It is an immaterial circumstance that Clark's contribution to the common stock of the firm consisted of his time, skill and services, for these are the equivalent of money or other material contribution; and his rights, therefore, were the same as if he had furnished capital of the latter description: Bradbury *v.*

Smith, 21 Maine 117; Collyer on Part. sec. 169; Parsons on Part. pp. 47, 54, 55, 56.

The transactions of partners are always to be looked at in determining their rights, even under written articles : Collyer on Part. sec. 209; Parsons on Part. 519; Greddes *v.* Wallace, 2 Bligh 295.

Improvements made with partnership funds, even on real estate belonging to one of the partners, will be treated as the personal property of the partnership : 1 Parsons on Cont. 128 ; Parsons's Mer. Law 174; 3 Kent 43, note 2 ; Lacy *v.* Hall, 1 Wright 360; Meason *v.* Kaine, 13 P. F. Smith 335.

*Marshall & Patterson,* for appellees.

The opinion of the court was delivered, November 22d 1872, by Agnew, J.—By the article of copartnership of January 2d 1860, between James Marshall and Robert P. Clarke, Marshall contributed to the capital of the company certain real estate at an estimated valuation, inventoried and carried into the stock account. Thenceforth this property became in equity partnership property, the legal title remaining in Marshall. But on dissolution Marshall reserved the right not to be bound by the estimated value, and to withdraw the property. Evidently the right to withdraw was the contract provision for correcting the estimated valuation. But when the foundry buildings were destroyed by an accident, and rebuilt by mutual consent with partnership funds, how did the case stand? The part destroyed was gone and incapable of withdrawal. The loss necessarily fell upon the partnership, for the property was then partnership property and a part of the capital; Marshall had been credited with its value in the stock account. When dissolution came he could not withdraw the burnt part which was destroyed and gone, while the buildings which filled its place were the product of the investment of partnership funds with Marshall's consent, and were of a different value. This portion was no longer the same put in by Marshall, and its withdrawal could not correct the estimated value, for the rebuilt portion had no inventoried valuation. Even the money invested did not represent the enhanced value at the time of dissolution. The lots had no designated value apart from the destroyed buildings, the contract provided for no such contingency, and afforded no means of making a relative valuation of the lots and new buildings. If, therefore, on dissolution Marshall took the foundry property he would withdraw what he did not put in, without a contract mode of determining the relative values of the lots and the new buildings. The design of the reservation clause was to enable Marshall to correct the original valuation. But such a withdrawal could not correct the value of

[Clark's Appeal.]

what he put in.  Its condition was altered.  The destruction of a part left the undestroyed part without a relative or designated value, while the destroyed part being gone was incapable of valuation.  Nor did the whole as renewed represent the same value as the whole when it was brought in, for it does not appear that the money expended was the equivalent in value of the part destroyed.  No intent to make an exact equivalent appears.  As the foundry stood at the dissolution it was wholly a different thing in value and in condition from that which it was when contributed by Marshall.  How then could he claim it as a right to withdraw the property and take it to himself?  He could not withdraw it at the same value at which he contributed it, for the rebuilding necessarily involved a revaluation, for which no provision was made by the parties.  Having a credit already in his stock account for the value of the property, the property with its accretions necessarily belonged to the firm, and must be accounted for as partnership assets.  The situation of the parties had been altered by the fire and by the mutual consent to rebuild with partnership funds.  Clark had given his personal attention and services to the business during the suspension by the fire and rebuilding, and was also entitled to his share of the benefit of the investment of the partnership funds in the new building, and was entitled to the accretion in value by lapse of time and the rise of property.  If Marshall did not intend these advantages to accrue to the partnership it was his duty to have refused to rebuild with partnership funds, and to have claimed his right to withdraw, if indeed it were even practicable to withdraw the unburned portion of the foundry property.  But when he permitted the incorporation of the partnership funds with the unburned part, he consented to the existence of a new thing, which in fairness and justice he could not withdraw to the prejudice of Clark, who is entitled as well as himself to the enhancement in value of that which was produced by the partnership.  The partnership can be settled only by treating the foundry as partnership property, ascertaining its value at the time of dissolution, and stating the account accordingly.  The foundry would comprehend only the ground necessarily connected with it, and used as a part of it.  Detached lots, not the subject of the removal by the partnership and not necessary for the use of the rebuilt part, would not be considered a part of the foundry, and might be withdrawn.

> Decree of the court below reversed, and the record remitted with a direction to refer the account to the same or another master for a restatement according to the principles contained in the foregoing opinion, and the costs of the appeal to abide the final order of the court.